**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| IOENGINE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD. and SAMSUNG ELECTRONICS AMERICA, INC.,<br><br>Defendants. | Civil Action No. 2:26-cv-00866<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff IOENGINE, LLC ("IOENGINE") files this Complaint against Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1. IOENGINE's founder, Scott McNulty, has spent his career developing, commercializing, and marketing cutting edge technology. Fresh out of college, Mr. McNulty's first job was at a Madison Avenue advertising agency. Though he worked on award-winning campaigns for clients ranging from Coca-Cola to W.R. Grace, he found himself gravitating to projects focused on the latest consumer technology products. This experience led him to develop advertising campaigns for some of the era's most important technological innovations, including the first filmless camera, an early cellular telephone, and a new generation of televisions. His work earned some of advertising's highest honors, including multiple Clio Awards and the prestigious Gold Lion at the Cannes International Advertising Festival.

2. In the early 1990s, Mr. McNulty was recruited away from advertising and into product development at a major technology company. There, he served as the product manager for the Zip drive, a highly portable data storage system whose disks stored 70x the amount of data and were 85x faster than existing floppy drives. That work immersed him in the data storage technologies of the day, and set the stage for the inventions at issue in this case.

3. While attending the Consumer Electronics Show in 2001, Mr. McNulty saw data storage devices implementing the then just-released USB 2.0 standard. He recognized that these small USB keys—each with its own processor, memory, and storage—were not merely hard drives, but computers in their own right. This led him to ponder the implications of cheap, tiny computers everywhere.

4. But he soon realized that a computer the size of a USB stick was too small to have its own input/output mechanisms, such as a keyboard, mouse, or screen. This posed a challenge. Miniature computers would be of limited use if you could not meaningfully engage with them. The apparent solution, connecting the small device to a larger host computer, created a different problem. Under the then-ubiquitous control paradigm, giving a host computer access to a portable device meant surrendering the portable device to the host's complete control, and with it the security of the data the device carried.

5. Mr. McNulty took a different approach. He conceived of a portable device that carried its own processing and memory resources and was specially programmed so that it could communicate with, and even commandeer, a larger device (such as a desktop or laptop computer). This would allow the devices to retain the benefits of being small (e.g., extreme portability), but also accessible through traditional user interfaces, all while safeguarding the device's data.

6. Mr. McNulty also anticipated that data would increasingly live on network servers

instead of local drives, and that his new class of portable devices would therefore need network access. So he developed the software and communication protocols that let a portable device "tunnel" through a larger device and use its network connection—or, if necessary, access those same resources using the portable device's own network connection—in each case without compromising the security of either device.

7. Mr. McNulty founded IOENGINE to commercialize these inventions. The name reflects the central concept: an engine for the input and output needs of a new class of highly portable computing devices. IOENGINE hired engineers, built dozens of working prototypes, and disclosed its work to the public through the patent system, which has issued IOENGINE more than 15 patents.

8. What Mr. McNulty invented in the early 2000s enables Samsung's modern portable products. A Galaxy smartwatch, a set of Galaxy Buds, a Samsung portable drive, and a Galaxy smartphone are each a highly portable computer with its own processor, memory, and storage. Each is set up and operated through an interactive user interface that Samsung's software presents on the larger, familiar screen of a paired smartphone, personal computer, or vehicle infotainment system. Each reaches Samsung's servers and third-party servers through the network connection of the device it is paired with and, on network-equipped models, through its own. And each does so securely, so that the data it carries about its user is protected in transit. Samsung's portable device businesses are built on precisely the architecture and protocols that Mr. McNulty conceived, disclosed, and patented.

9. The patent system is designed to encourage innovation and the disclosure of new ideas by granting inventors exclusive rights to their inventions for a limited period in exchange for teaching the public how those inventions work. Those rights reward individual ingenuity, and they

preserve a marketplace in which technological progress is driven by creativity and merit. Samsung has made extensive, unauthorized use of IOENGINE's patented technology without seeking a license or paying compensation. This case seeks to ensure that the rights of the inventor are acknowledged and respected.

## THE PARTIES

10. IOENGINE is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 22 Ensign Road, Norwalk, Connecticut 06853. IOENGINE was founded by Scott McNulty, the sole named inventor of the patents asserted in this action, and IOENGINE owns those patents.

11. On information and belief, Defendant Samsung Electronics Co., Ltd. ("SEC") is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-Ro, Yeongtong-Gu, Suwon-Si, Gyeonggi-Do, Korea 16677. SEC designs, manufactures, and sells the products accused of infringement in this Complaint, and causes those products to be imported into and sold in the United States, including in this District.

12. On information and belief, Defendant Samsung Electronics America, Inc. ("SEA") is a corporation organized and existing under the laws of the State of New York. SEA is a wholly owned subsidiary of SEC and is SEC's principal United States operating subsidiary. SEA maintains its United States headquarters at 6625 Excellence Way, Plano, Texas 75023, in Collin County, within this District.[1] SEA may be served through its registered agent in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

13. On information and belief, in all respects relevant to the products accused of

---

[1] *Samsung Decamps from New Jersey to Plano for new US HQ*, THE REAL DEAL (June 3, 2026), https://therealdeal.com/texas/2026/06/03/samsung-decamps-from-new-jersey-to-plano-for-new-us-hq/ (Ex. 6).

infringement in this Complaint, SEC and SEA acted in concert with one another in designing, making, using, importing, offering for sale, and selling those products in the United States.

## JURISDICTION AND VENUE

14. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100 *et seq.*, including but not limited to 35 U.S.C. § 271.

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

16. This Court has personal jurisdiction over Samsung. On information and belief, Samsung is subject to this Court's general and specific personal jurisdiction consistent with due process and the Texas long-arm statute, due to its (i) substantial and continuous business in this forum, including the commission of at least a portion of the infringing acts alleged herein; (ii) maintenance of a regular and established place of business in this District; and (iii) regularly doing or soliciting business in Texas, engaging in other persistent courses of conduct in Texas, recruiting Texas residents for employment, and deriving substantial revenue from the infringing goods and services it has provided to persons and entities in Texas.

17. On information and belief, within this State, Samsung has offered for sale and sold, and continues to offer for sale and sell, products embodying the patented inventions, thereby committing acts of patent infringement alleged herein. Samsung does so through its own website and retail channels, through national and regional retailers and wireless carriers with stores in this District, and through authorized Samsung dealers located in this District. On information and belief, Samsung also provides warranty service, technical support, software updates, and cloud services to purchasers and users of those products who reside in this District.

18. Venue is proper in this District as to SEA under 28 U.S.C. §§ 1391 and 1400(b)

because SEA has committed at least a portion of the infringing acts at issue in this case from and within this District and has a regular and established place of business in this District at 6625 Excellence Way, Plano, Texas 75023.

19. The Plano facility is SEA's United States headquarters. It is a physical place in this District, it is a regular and established place of business, and it is SEA's own: SEA owns and occupies the campus, holds it out to the public as its United States headquarters, staffs it with its own employees, and conducts its United States business from it.[2]

20. Acts of infringement occur at the Plano facility. On information and belief, SEA directs and conducts from that facility the United States marketing, sales, distribution, and technical support of the Accused Products. On information and belief, SEA personnel at that facility use the Accused Products, including by pairing them to terminals, configuring them, registering them to Samsung accounts, installing software updates, and synchronizing data with Samsung's servers, in the course of product development, product testing, demonstration, training, and customer support. Each such use places the portable device, the terminal, and the communications network node into the configuration recited in the asserted claims, and each therefore constitutes a use of the claimed inventions in this District.

21. On information and belief, SEA also imports the Accused Products into the United States and directs their distribution to retailers, wireless carriers, and customers in this District from that facility, and SEA employs a substantial number of persons in this District, including at that facility.

22. Venue is proper in this District as to SEC under 28 U.S.C. § 1391(c)(3), because SEC is not a resident of the United States and may be sued in any judicial district.

---

[2] *See* Ex. 6.

23. Samsung has repeatedly litigated patent infringement actions in this District, both as plaintiff and as defendant, and this District is a familiar and convenient forum for it.

## THE IOENGINE PATENTS-IN-SUIT

### A. The Patents-in-Suit

24. U.S. Patent No. 7,861,006 ("the '006 patent") was filed on March 23, 2004 and issued on December 28, 2010. U.S. Patent No. 9,059,969 ("the '969 patent") was filed on August 6, 2013 and issued on June 16, 2015. U.S. Patent No. 10,397,374 ("the '374 patent") was filed on September 22, 2017 and issued on August 27, 2019. U.S. Patent No. 10,447,819 ("the '819 patent") was filed on September 22, 2017 and issued on October 15, 2019. U.S. Patent No. 10,992,786 ("the '786 patent") was filed on July 18, 2019 and issued on April 27, 2021. Each of the five patents is titled "Apparatus, Method and System for a Tunneling Client Access Point," and each names Scott McNulty as its sole inventor. The '006, '969, '374, '819, and '786 patents are referred to collectively as the "Patents-in-Suit."[3] True and correct copies of the '006, '969, '374, '819, and '786 patents are attached as Exhibits 1, 2, 3, 4, and 5, respectively.

25. The Patents-in-Suit are members of a single patent family and share a common specification. The '006 patent issued from U.S. Patent Application Ser. No. 10/807,731, filed March 23, 2004. The '969 patent issued from U.S. Patent Application Ser. No. 13/960,514, a continuation of U.S. Patent Application Ser. No. 12/950,321, filed November 19, 2010 (issued as U.S. Patent No. 8,539,047), which was itself a continuation of the application that issued as the '006 patent. The '374 and '819 patents issued from U.S. Patent Application Ser. Nos. 15/712,714 and 15/712,780, each a continuation of U.S. Patent Application Ser. No. 14/721,540, filed May

---

[3] All specification citations are to the '969 patent, though all patents have corresponding disclosures.

26, 2015 (issued as U.S. Patent No. 9,774,703), which was a continuation of the application that issued as the ’969 patent. The ’786 patent issued from U.S. Patent Application Ser. No. 16/516,244, filed July 18, 2019, a continuation in the same chain. Each of the Patents-in-Suit therefore claims priority to the application filed on March 23, 2004.

26. IOENGINE owns all rights and title to the Patents-in-Suit, including the right to recover damages for past infringement. Each of the Patents-in-Suit is valid and enforceable.

**B. The State Of Portable Computing When Mr. McNulty Filed His Application**

27. The specification of the Patents-in-Suit opens by describing the trend that prompted the invention: “[c]omputing devices have been becoming smaller over time.”[4] In the early 2000s, the smallest computing devices were personal digital assistants, which “usually come with a touch screen, an input stylus and/or mini keyboard, and battery source” and “typically, have storage capacities around 64 MB.”[5]

28. Those devices were an unsatisfying compromise. As the specification explains, although portable computing systems existed, “no effective solution to securely access, execute, and process data [wa]s available in an extremely compact form.”[6] PDAs, “which are considered among the smallest portable computing solution, are bulky, provide uncomfortably small user interfaces, and require too much power to maintain their data.”[7]

29. They were also expensive and constrained. “Current PDA designs are complicated and cost a lot because they require great processing resources to provide custom user interfaces and operating systems,” and “current PDAs are generally limited in the amount of data they can

---

[4] *See* Ex. 2, ’969 patent, at 1:19.

[5] *See id.* at 1:21-24.

[6] *See id.* at 2:26-28.

[7] *See id.* at 2:28-31.

store or access."[8]

30. The specification identifies the gap that no one had filled. "No solution exist[ed] that allow[ed] users to employ traditional large user interfaces they are already comfortable with, provide[d] greater portability, provide[d] greater memory footprints, dr[ew] less power, and provide[d] security for data on the device."[9] Solving all five of those problems at once, in a device small enough to carry in a pocket, is the technical problem to which the Patents-in-Suit are directed.

### C. Mr. McNulty's Invention

31. Mr. McNulty's solution, which the specification calls a tunneling client access point or "TCAP," inverted the conventional relationship between a small device and a large one. Rather than build a better small screen, the portable device borrows a large one. The disclosed TCAP "is very easy to use; at most it requires the user to simply plug the device into any existing and available desktop or laptop computer,"[10] "through which, the TCAP can make use of a traditional user interface and input/output (I/O) peripherals, while the TCAP itself, otherwise, provides storage, execution, and/or processing resources."[11]

32. Because the portable device supplies its own storage and processing, it does not need the power and complexity that made PDAs bulky: "the TCAP requires no power source to maintain its data and allows for a highly portable 'thumb' footprint."[12] The specification describes the result as a technical advance, stating that "the above-identified problems of limited computing devices are overcome and a technical advance is achieved in the art of portable computing and

---

[8] *See* Ex. 2, '969 patent, at 2:31-34.

[9] *See id.* at 2:35-39.

[10] *See id.* at 2:40-42.

[11] *See id.* at 2:43-46.

[12] *See id.* at 2:46-48.

data access."[13]

33. The larger device that supplies the user interface is what the specification calls an access terminal, and what the claims call a terminal. It may be "any number of computing devices such as servers, workstations, desktop computers, laptops, portable digital assistants (PDAs), and/or the like."[14] Indeed, "[t]he type of AT used is not important other than the device should provide a compatible mechanism of engagement to the TCAP and provide an operating environment for the user to engage the TCAP through the AT."[15]

34. The specification describes several ways for the portable device to connect to the terminal, and it is not limited to a physical connection. In one embodiment "the TCAP provides a universal serial bus (USB) connector through which it may plug into an AT."[16] In others, "the TCAP may employ Bluetooth, WiFi and/or other wireless connectivity protocols to connect with ATs that are also so equipped," and "the TCAP may use Bluetooth to establish a wireless connection with a number of ATs" or "may employ WiFi."[17]

35. Once connected, program code delivered by the portable device drives an interactive user interface on the terminal's screen. The terminal "provides Java and/or Windows runtime environments, which allows the TCAP to interact with the input/output mechanisms of the AT,"[18] the user is "presented with a login prompt" on the terminal's display,[19] and "[o]nce the TCAP has engaged with an AT, it can provide the user with access to its storage and processing

[13] *See* Ex. 2, '969 patent, at 2:52-55.

[14] *See id.* at 3:47-49.

[15] *See id.* at 3:49-52.

[16] *See id.* at 3:53-54.

[17] *See id.* at 3:55-57.

[18] *See id.* at 3:58-60.

[19] *See id.* at 4:39.

facilities."[20]

36. The invention also reaches beyond the terminal to resources on a communications network. "If the AT is connected to a communication network 113, the TCAP may then communicate beyond the AT,"[21] and "the TCAP can provide extended storage and/or processing resources by engaging servers" across that network.[22] To the user, "the contents of the TCAP 130 appear on the AT as being contained on the TCAP 125 even though much of the contents may actually reside on the servers 115, 120 and/or the servers' storage facilities 105."[23]

37. That architecture is what the specification means by tunneling, and it is what preserves the security of the data the portable device carries. "[T]he TCAP 'tunnels' data through an AT. The data may be provided through the AT's I/O for the user to observe without it actually residing on the AT."[24] And "the TCAP may tunnel data through an AT across a communications network to access remote servers without requiring its own more complicated set of peripherals and I/O."[25] By "providing the equivalent of a plug-n-play virtual private network (VPN), the TCAP provides certain kinds of accessing of remote data in an easy and secure manner that was unavailable in the prior art."[26]

38. The claims of the Patents-in-Suit capture three related architectures drawn from that disclosure. In the first, the portable device reaches a communications network node through the network connection of the terminal. In the second, the portable device reaches the network

---

[20] *See* Ex. 2, '969 patent, at 3:62-63.

[21] *See id.* at 3:64-65.

[22] *See id.* at 3:66-67.

[23] *See id.* at 4:21-24.

[24] *See id.* at 4:25-27.

[25] *See id.* at 4:27- 30.

[26] *See id.* at 2:48-51.

node over a network connection of its own. In the third, it does both. The ’006 and ’969 patents claim the first architecture, the ’819 patent claims the second, and the ’374 and ’786 patents claim the second and the third.

**COMPLIANCE WITH 35 U.S.C. § 287**

39. IOENGINE has complied with the marking requirements of 35 U.S.C. § 287 with respect to each of the Patents-in-Suit, to the extent they apply.

40. IOENGINE did not itself make, use, offer for sale, sell, or import any product that practices any of the Patents-in-Suit after the issuance of each of the respective Patents-in-Suit. IOENGINE therefore has no marking obligation of its own under 35 U.S.C. § 287.

41. IOENGINE has granted a single license under the ’006 and ’969 patents, to Interactive Media Corporation (“IMC”), which sells secure USB storage devices under the Kanguru brand name. That license, entered into in May 2018, contains a marking requirement.

42. On information and belief, IMC has marked the licensed products, the Kanguru Defender line of secure memory devices, continuously since the license was entered into in May 2018. IMC marks those products in accordance with 35 U.S.C. § 287(a) by including the word “Pat.” together with the internet address https://www.kanguru.com/pages/our-partners on the product packaging. That webpage identifies the IOENGINE patents, including the ’006 and ’969 patents, and associates them with the licensed products.[27] IOENGINE has made reasonable efforts to monitor the marking of these products. On information and belief, the Kanguru Defender products do not practice the ’374, ’819, or ’786 patents.

43. There are no other licensees under the ’006 or ’969 patents and no other products

---

[27] *Our Partners*, KANGURU, https://www.kanguru.com/pages/our-partners (last visited Sept. 18, 2026) (Ex. 14).

that were subject to a marking obligation with respect to those patents. IOENGINE has therefore provided constructive notice of the ’006 and ’969 patents under 35 U.S.C. § 287(a) and is entitled to recover damages for infringement occurring up to six years before the filing of this Complaint, as provided by 35 U.S.C. § 286.

44. No license has been granted under the ’374, ’819, or ’786 patents, and there are no products made, offered for sale, or sold by IOENGINE or by any licensee of IOENGINE that were subject to a marking obligation with respect to those patents.

## ACCUSED PRODUCTS

45. The “Accused Products” are four categories of Samsung portable devices, together with the Samsung applications and the Samsung servers and services with which those devices communicate: Samsung’s smartwatches and fitness bands, Samsung’s wireless earbuds, Samsung’s portable drives, and Samsung’s Galaxy smartphones.

46. *Smartwatches and fitness bands.* The accused smartwatches and fitness bands (“Smartwatch Accused Products”) include without limitation the Galaxy Watch, Galaxy Watch Active, Galaxy Watch Classic, Galaxy Watch Pro, Galaxy Watch Ultra, Galaxy Watch FE, and Galaxy Fit lines of products, and all other Samsung smartwatches and fitness bands with similar capabilities and functionalities as described herein. All Galaxy smartwatches and fitness bands are exemplary, though the Galaxy Watch Ultra is primarily analyzed herein. Each is a portable device with its own processor, memory, and storage. Each can communicate with a paired smartphone over Bluetooth or Wi-Fi, and network-equipped models communicate with Samsung’s servers and third-party servers over their own Wi-Fi or cellular connection.

47. A smartphone (or other computing device, such as a tablet, laptop, or desktop computer) running the Galaxy Wearable application is a terminal within the meaning of the

Patents-in-Suit. It necessarily has a processor; an input component and an output component, namely its touchscreen; a network communication interface, namely its Wi-Fi and cellular radios; and a memory storing executable program code, namely the Galaxy Wearable application, which when executed presents a graphical interactive user interface on the smartphone's touchscreen.[28] A user manipulates elements of that interface to pair the watch and the smartphone, to update the software on the watch, to set notifications and alerts, to modify health and fitness data, and to select content to be downloaded to or synchronized with the watch.

48. *Earbuds*. The accused earbuds ("Earbud Accused Products") include without limitation the Galaxy Buds, Galaxy Buds Plus, Galaxy Buds Live, Galaxy Buds Pro, Galaxy Buds2, Galaxy Buds2 Pro, and Galaxy Buds FE, and all other Samsung earbuds with similar capabilities and functionalities as described herein. All earbuds are exemplary, though the Galaxy Buds2 Pro is primarily analyzed herein. Each is a portable device with its own processor, memory, and storage, and each communicates with a terminal – such as a Samsung Galaxy smartphone, a Samsung television, or a Galaxy Book series personal computer – over Bluetooth, supporting the A2DP, AVRCP, and HFP Bluetooth profiles.[29] Samsung's Galaxy Wearable application, running on a smartphone (or other computing device, such as a tablet, laptop, or desktop computer) presents the interactive user interface through which a user pairs the earbuds, configures them, updates their firmware, and controls their features.

49. *Portable drives*. The accused portable drives ("Portable Drive Accused Products") include without limitation the Samsung Portable SSD T5, T7, T7 Touch, T7 Shield, T9, and T5

---

[28] *Galaxy Wearable*, SAMSUNG, https://www.samsung.com/us/support/owners/app/galaxy-wearable-watch (last visited Sept. 18, 2026) (Ex. 13).

[29] *Galaxy Buds2 Pro*, SAMSUNG, https://www.samsung.com/us/mobile/audio/headphones/galaxy-buds2-pro-bora-purple-sm-r510nlvaxar/ (last visited Sept. 18, 2026) (Ex. 8).

EVO lines of products, and all other Samsung portable drives with similar capabilities and functionalities as described herein.[30] All Samsung portable drives are exemplary, though the Samsung Portable SSD T7 is primarily analyzed herein. It is a portable device with its own processor, memory, and storage, weighing 72 grams and measuring 85 by 57 by 8 millimeters.[31] It connects to a terminal – a Windows or Mac personal computer, such as a Samsung Galaxy Book – through a universal serial bus conduit, and Samsung ships it bundled with USB Type C-to-C and Type C-to-A cables.[32]

50. The Samsung Portable SSD T7 ships with Samsung Portable SSD Software stored on the drive itself. As Samsung explains, "[w]ith embedded intuitive software for PCs and Macs, you can easily set password, check capacity, and get the latest firmware updates."[33] Samsung identifies the software by name in the product's specifications as "Samsung Portable SSD Software 1.0."[34] When executed on a personal computer (or other computing device, such as a tablet, laptop, or desktop computer), that software presents an interactive user interface on the computer's display, through which the user sets a password, enables and disables the drive's security mode, and downloads and installs firmware updates from Samsung's servers. Samsung's user

---

[30] *Differences between Samsung portable drives*, SAMSUNG, https://www.samsung.com/us/support/answer/ANS10002047/ (last visited Sept. 19, 2026) (Ex. 23).

[31] *Samsung Portable SSD T7 Data Sheet*, SAMSUNG, Rev. 2.0 (2024), https://download.semiconductor.samsung.com/resources/data-sheet/Samsung_Portable_SSD_T7_Datasheet_Rev2.0.pdf (last visited Sept. 18, 2026) (Ex. 10).

[32] *Portable SSD T7 Series Brochure*, SAMSUNG, https://download.semiconductor.samsung.com/resources/brochure/PSSD-T7_Series-Brochure_Web_2109_230509.pdf (last visited Sept. 18, 2026) (Ex. 9).

[33] *See id.*

[34] *Portable SSD T7 1TB USB 3.2*, SAMSUNG, https://www.samsung.com/us/memory-storage/portable-ssd/portable-ssd-t7-usb-3-2-1tb-blue-sku-mu-pc1t0h-am/ (last visited Sept. 18, 2026) (Ex. 11).

documentation further explains that if the user reformats the drive, the "Samsung Portable SSD Software stored in the drive will be deleted," and directs the user to download the application again – confirming that the software resides in the drive's own memory and executes on the terminal.[35]

51. *Smartphones*. The accused smartphones ("Smartphone Accused Products") include without limitation the Galaxy S, Galaxy Note, Galaxy Z Fold, Galaxy Z Flip, and Galaxy A lines of products, and all other Samsung smartphones with similar capabilities and functionalities as described herein. All Samsung smartphones are exemplary, though the Samsung Galaxy S23 Ultra is primarily analyzed herein. Each is a portable device with its own processor, memory, storage, and network connection. Android Auto is integrated into those phones; as Google explains, "Android Auto is integrated into phones. You do not need to download it." When a Galaxy smartphone is connected to a compatible vehicle – over a USB cable or wirelessly – Android Auto brings apps "on your car display," presenting an interactive user interface on the vehicle's infotainment screen.[36] The vehicle infotainment system is a terminal within the meaning of the Patents-in-Suit: it has a processor, a display, an input component in the form of a touchscreen or steering-wheel controls, and a memory storing program code.

52. In that configuration the Galaxy smartphone supplies the processing, the storage, and the network connection, while the vehicle supplies the screen and the controls. A user manipulates elements of the interface on the vehicle display to place calls, send and receive messages, select navigation destinations, and choose media, and each such manipulation causes a

---

[35] *Samsung Portable SSD T7 User Manual*, SAMSUNG, at 9, https://download.semiconductor.samsung.com/resources/user-manual/Samsung_Portable_SSD_T7_User_Manual_English_1.1.pdf (last visited Sept. 18, 2026) (Ex. 15).

[36] *Get started with Android Auto*, GOOGLE, https://support.google.com/androidauto/answer/6348029 (last visited Sept. 18, 2026) (Ex. 12).

communication to be transmitted to the smartphone, which in turn executes program code and communicates over its own cellular or Wi-Fi connection with Samsung's servers and third-party servers. The results of those communications are then presented back on the vehicle display.[37]

53. The communications between the Accused Products, their terminals, and Samsung's servers are secure. On information and belief, those communications are protected using encryption protocols, including Transport Layer Security for communications carried over the Internet and the link-layer encryption specified by the Wi-Fi and Bluetooth standards, and the responses returned from Samsung's servers to the terminal are likewise encrypted.

## ALLEGATIONS OF PATENT INFRINGEMENT

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 7,861,006

54. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

55. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '006 patent, including the right to recover damages for past infringement. The '006 patent is valid and enforceable.

56. On information and belief, Samsung has infringed and continues to infringe the '006 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practice at least claim 1 of the '006 patent, including the Portable Drive Accused Products and Smartphone Accused Products. On information and belief, in relevant respects for those products, SEC and SEA act in concert with one another.

---

[37] *See* Ex. 12.

57. The Portable Drive Accused Products and Smartphone Accused Products meet every limitation of at least claim 1 of the ’006 patent, which recites:

> 1. A portable tunneling storage and processing apparatus, comprising:
>
> (a) a conduit for external communications configured to enable the transmission of a plurality of communications between the portable apparatus and a terminal comprising a terminal processor, a first input component, a first output component comprising a display device, and a network interface configured to enable the terminal to communicate with at least one network server, wherein the conduit for external communications is a universal serial bus conduit;
>
> (b) a processor; and
>
> (c) a memory configured to communicate with the portable apparatus processor, wherein the memory has a unique apparatus identifier and a plurality of processing instructions stored thereon, including:
>
> (1) a first set of processing instructions, which when executed by the terminal processor, enables a user to employ the first input component and the terminal display device to interact with the portable apparatus and provides the portable apparatus with access to the terminal network interface;
>
> (2) at least one processing instruction, which when executed, causes an interactive user interface to be presented on the terminal display device, wherein the interactive user interface is configured to enable the user to:
>
> (i) cause the portable apparatus processor to execute a set of processing instructions stored on the portable apparatus memory; and
>
> (ii) cause the portable apparatus to transmit a request to access a server; and
>
> (3) at least one processing instruction, which when executed by the portable apparatus processor in response to receiving a command resulting from user interaction with the interactive user interface, (i) causes the portable apparatus processor to execute a second set of processing instructions stored on the portable apparatus memory and effect the display of processing activity of the second set of processing instructions on the terminal display device, and (ii) causes the portable apparatus to transmit a request to access a server,
>
> wherein the portable apparatus is configured to communicate with the terminal and to communicate through the terminal network interface with a server, and
>
> wherein the portable apparatus processor is configured to facilitate the storage of encrypted data on the portable apparatus memory, encrypt communications transmitted by the portable apparatus, and decrypt encrypted communications received by the portable apparatus.

58. Each Portable Drive Accused Product is a portable tunneling storage and processing apparatus. It is a self-contained storage device weighing 72 grams that carries its own processor,

memory, and storage, and that operates through a personal computer to which it is connected.[38]

59. Each Portable Drive Accused Product has a conduit for external communications that is a universal serial bus conduit. Samsung ships the drive bundled with USB Type C-to-C and Type C-to-A cables, and the drive connects to a personal computer over that USB conduit.[39]

60. The terminal comprises a terminal processor, a first input component, a first output component comprising a display device, and a network interface configured to enable the terminal to communicate with at least one network server. A Windows or Mac personal computer, such as a Samsung Galaxy Book, necessarily has a processor, a keyboard and pointing device, a display, and a network interface through which it communicates with servers over the Internet.

61. Each Portable Drive Accused Product has a processor and a memory configured to communicate with that processor. The memory has a unique apparatus identifier – each drive carries a unique serial number – and a plurality of processing instructions stored thereon, namely the Samsung Portable SSD Software that Samsung preinstalls on the drive.[40]

62. Samsung's own user manual for the T7 confirms that the Samsung Portable SSD Software resides on the drive and is run on the connected computer. The manual instructs the user to "[i]n the Explorer (Windows OS) or Desktop (Mac OS), select the 'Samsung Portable SSD 1.0' application," identifies the software as being "[f]or Security Mode and Firmware update" and "[f]or PCs and Macs," and warns that if the user formats the drive, "Samsung Portable SSD Software stored in the drive will be deleted":[41]

---

[38] *See* Ex. 9.

[39] *See id.*

[40] *See id.*

[41] *Samsung Portable SSD T7 User Manual*, SAMSUNG, at 9, https://download.semiconductor.samsung.com/resources/user-

**Installing Samsumg Portable SSD Software 1.0**

**(For Security Mode and Firmware update)**

For PCs and Macs

In the Explorer (Windows OS) or Desktop (Mac OS), select the "Samsung Portable SSD 1.0" application.

Windows OS: SamsungPortableSSD_Setup_Win_1.0.exe
Mac OS: SamsungPortableSSD_Setup_Mac_1.0.pkg

* If you format partition of the T7 after purchase, Samsung Portable SSD Software stored in the drive will be deleted. In such case, please download the "Samsung Portable SSD Software 1.0" application from Samsung website (http://www.samsung.com/samsungssd).

* Samsung Portable SSD Software 1.0 is only for T7 Touch and T7, so installation of Samsung Portable SSD Software 1.0 will not automatically remove Samsung Portable SSD Software (previous version), if remaining in your computer, which was designed for T3, T5, X5.

63. The memory stores a first set of processing instructions which, when executed by the terminal processor, enables a user to employ the first input component and the terminal display device to interact with the portable apparatus and provides the portable apparatus with access to the terminal network interface. The Samsung Portable SSD Software executes on the personal computer, allows the user to operate the drive using the computer's keyboard, pointing device, and display, and uses the computer's network interface to reach Samsung's servers for firmware updates.[42]

64. The memory stores at least one processing instruction which, when executed, causes an interactive user interface to be presented on the terminal display device. The Samsung Portable SSD Software presents an interactive user interface on the personal computer's display, through which the user causes the drive's processor to execute processing instructions stored on the drive—setting a password, enabling and disabling Security Mode, and encrypting and

---

manual/Samsung_Portable_SSD_T7_User_Manual_English_1.1.pdf (last visited Sept. 18, 2026) (Ex. 15).

[42] *See* Ex. 9.

decrypting stored data—and through which the user causes the drive to transmit a request to access Samsung's firmware update server.[43]

65. The memory stores at least one processing instruction which, when executed by the drive's processor in response to a command resulting from user interaction with that interface, causes the drive's processor to execute a second set of processing instructions stored on the drive and to effect the display of the processing activity of those instructions on the computer's display, and causes the drive to transmit a request to access a server. When the user initiates a firmware update or a security operation, the drive executes the corresponding code, the progress and result of that operation are displayed in the Samsung Portable SSD Software interface on the computer, and the drive requests the update from Samsung's server through the computer's network interface.[44]

66. Each Portable Drive Accused Product is configured to communicate with the terminal and to communicate through the terminal network interface with a server, as described in the preceding paragraphs.

67. The processor of each Portable Drive Accused Product is configured to facilitate the storage of encrypted data on the drive's memory, to encrypt communications transmitted by the drive, and to decrypt encrypted communications received by the drive. Samsung specifies the drive's encryption as "AES 256-bit hardware encryption" and states that "[t]he password protection based on AES 256-bit hardware encryption keeps your files secure."[45] Because the encryption is performed in hardware on the drive, the drive's processor encrypts data as it is written

---

[43] *See* Ex. 9.

[44] *See id.*

[45] *See* Ex. 10.

and decrypts data as it is read.[46]

68. Each Smartphone Accused Product likewise practices claim 1 of the ’006 patent. Each is a portable tunneling storage and processing apparatus: a self-contained device that carries its own processor, memory, and storage, and that operates through a larger computing device to which it is connected.

69. Each Smartphone Accused Product has a conduit for external communications that is a universal serial bus conduit. Samsung equips its smartphones with a USB Type-C port and ships them with a USB cable, and Samsung instructs users to connect the phone to a computer or a vehicle over that port. Samsung identifies the available USB connection modes as “Charging phone only” and “Transferring files / Android Auto,” and directs the user to select the latter for “file transfer or Android Auto.”[47]

70. The terminal comprises a terminal processor, a first input component, a first output component comprising a display device, and a network interface configured to enable the terminal to communicate with at least one network server. A Windows or Mac personal computer connected to a Galaxy smartphone over USB necessarily has each of those components, and a vehicle infotainment system running Android Auto has a processor, a touchscreen and steering-wheel controls, a display, and a network interface.[48]

71. Each Smartphone Accused Product has a processor and a memory configured to communicate with that processor. The memory has a unique apparatus identifier – each phone carries a unique serial number – and a plurality of processing instructions stored thereon, including

[46] *See* Ex. 9.

[47] *Change the USB connection mode on your Galaxy phone or tablet*, SAMSUNG, https://www.samsung.com/us/support/answer/ANS10013049/ (last visited Sept. 19, 2026) (Ex. 24).

[48] *See* Ex. 12.

the Android Auto software that Samsung preinstalls. As Google explains, "Android Auto is integrated into phones. You do not need to download it."[49]

72. Those processing instructions, when executed, enable a user to employ the terminal's input component and display device to interact with the phone, provide the phone with access to the terminal's network interface, and cause an interactive user interface to be presented on the terminal display device. When a Galaxy smartphone is connected to a compatible vehicle over a USB cable, Android Auto brings apps "on your car display," and the user operates the phone through that display.[50]

73. Through that interface the user causes the phone's processor to execute processing instructions stored on the phone and causes the phone to transmit a request to access a server. When the user selects a navigation destination, requests media, or dictates a message on the vehicle display, the head unit transmits the resulting command to the phone, the phone executes the corresponding code, the processing activity is displayed back on the vehicle display, and the phone transmits a request to the servers that supply the directions, the media, or the messaging service.[51]

74. The processor of each Smartphone Accused Product is configured to facilitate the storage of encrypted data on the phone's memory, to encrypt communications transmitted by the phone, and to decrypt encrypted communications received by the phone. On information and belief, Galaxy smartphones encrypt user data at rest by default and protect communications with Samsung's servers and third-party servers using Transport Layer Security.

75. On information and belief, and for all the reasons above, Samsung has infringed and continues to infringe at least claim 1 of the '006 patent.

---

[49] *See* Ex. 12.

[50] *See* Ex. 17.

[51] *See* Ex. 12.

76. As a result of Samsung's infringement of the '006 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Samsung's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

77. Samsung's continuing infringement of the '006 patent has caused and will continue to cause IOENGINE irreparable harm for which there is no adequate remedy at law. IOENGINE is entitled to injunctive relief against Samsung's continuing infringement of the '006 patent or, in the alternative, to an ongoing royalty.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 9,059,969

78. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

79. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '969 patent, including the right to recover damages for past infringement. The '969 patent is valid and enforceable.

80. On information and belief, Samsung has infringed the '969 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 4 and 10 of the '969 patent, including the Earbud Accused Products, the Smartwatch Accused Products, the Portable Drive Accused Products, and the Smartphone Accused Products identified above. Samsung's infringement dates from at least six years prior to the filing of this Complaint until the expiration of the '969 patent on April 10, 2024. On information and belief, in relevant respects for those products, SEC and SEA acted in concert with one another.

81. During the infringing time period, those products met every limitation of at least

claim 1 of the '969 patent, from which the asserted claims depend, which recites:

> 1. A portable device configured to communicate with a terminal comprising a processor, an input component, an output component, a network communication interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to present an interactive user interface on the terminal output component, and second program code which, when executed by the terminal processor, is configured to provide a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface, the portable device comprising:
>
> (a) an external communication interface configured to enable the transmission of communications between the portable device and the terminal;
>
> (b) a processor; and
>
> (c) a memory having executable program code stored thereon, including:
>
> (1) third program code which, when executed by the portable device processor, is configured to provide a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between the portable device and the terminal, and facilitate communications to the terminal and to a communications network node through the terminal network communication interface; and
>
> (2) fourth program code which is configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface;
>
> wherein the portable device is configured to facilitate communications through the communication node on the terminal and the terminal network interface to a communications network node.

82. Each Earbud Accused Products was a portable device configured to communicate with a terminal. The Earbud Accused Products pair and communicate with a terminal such as a Samsung Galaxy smartphone, a Samsung television, or a Galaxy Book series personal computer, over Bluetooth.[52]

83. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. A Galaxy smartphone paired with an Earbud Accused Product necessarily has a processor, input and output

---

[52] *See* Ex. 8.

components in the form of a touchscreen, a network communication interface in the form of Wi-Fi and cellular radios, and a memory storing executable program code.

84. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component. The Galaxy Wearable application, when executed by the smartphone's processor, presents an interactive user interface on the smartphone's touchscreen through which the user controls the paired Earbud Accused Product.[53]

85. Samsung depicts that interface in its own product materials, showing a Galaxy smartphone presenting a pairing dialog for the Galaxy Buds2 Pro with "Connect" and "Close" user interface elements that the user manipulates to control the earbuds:[54]




86. The terminal memory also stored second program code which, when executed by the terminal processor, provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. A smartphone connected to an Earbud Accused

[53] *See* Ex. 13.

[54] *See* Ex. 8.

Product necessarily executes code that provides such a communications node, which passes communications to the earbuds over Bluetooth and to Samsung's servers over the smartphone's Wi-Fi or cellular connection.

87. Each Earbud Accused Products had an external communication interface configured to enable the transmission of communications between the portable device and the terminal, namely its Bluetooth radio, which Samsung identifies as supporting Bluetooth version 5.3 and the A2DP, AVRCP, and HFP profiles.[55]

88. Each Earbud Accused Products had a processor and a memory having executable program code stored thereon. Galaxy Buds necessarily contain processors and memory storing the executable code that runs the earbuds, implements active noise cancellation and audio processing, communicates with the paired terminal, and receives and installs firmware updates.

89. The memory of each Earbud Accused Products stored third program code which, when executed by the portable device processor, provided a communications node on the portable device to coordinate with the communications node on the terminal, established a communications link between the portable device and the terminal, and facilitated communications to the terminal and to a communications network node through the terminal network communication interface. The Earbud Accused Products pair with the terminal through the Galaxy Wearable application, and the resulting link enables the earbuds to send messages to Samsung's servers and third-party servers using the terminal's Internet connection. This occurs, for example, when pairing the earbuds, updating their firmware, configuring noise cancellation and equalizer settings, and registering the earbuds to a Samsung account.[56]

[55] *See* Ex. 8.

[56] *See* Ex. 13.

90. The memory of each Earbud Accused Products also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. When a user interacts with the touchscreen of a smartphone connected to an Earbud Accused Product through the Galaxy Wearable application, the smartphone sends a message to the earbuds, which in turn causes code on the earbuds to execute, including code that causes a message to be sent to Samsung's servers using the smartphone's Internet connection.

91. Each Earbud Accused Product was configured to facilitate communications through the communications node on the terminal and the terminal network interface to a communications network node, as described in the preceding paragraphs. Samsung's servers and the third-party servers with which the Accused Products communicate are communications network nodes.

92. The Smartwatch Accused Products met the same limitations, for the same reasons. Each was a portable device configured to communicate with a terminal. Samsung directs the user to "connect your smart watch to your phone using the Galaxy Wearable app," and explains that the Galaxy Wearable application "connects your smart watch to a compatible phone."[57]

93. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. A Galaxy smartphone paired with a Smartwatch Accused Product necessarily has a processor, input and output components in the form of a touchscreen, a network communication interface in the form of Wi-Fi and cellular radios, and a memory storing executable program code, namely the Galaxy

---

[57] *See* Ex. 18.

Wearable application.[58]

94. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component, and second program code which provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. The Galaxy Wearable application presents that interface on the smartphone touchscreen, and Samsung instructs that the user may "use the app to manage and monitor your watch's features and apps installed from the Play Store."[59] Samsung confirms that the Bluetooth link through that application is the communications node on which the watch depends: "Your phone and watch must be connected over Bluetooth through the Galaxy Wearable app to sync Samsung Health data."[60]

95. Each Smartwatch Accused Product had an external communication interface configured to enable the transmission of communications between the portable device and the terminal, namely its Bluetooth radio, and each had a processor and a memory having executable program code stored thereon.[61]

96. The memory of each Smartwatch Accused Product stored third program code which, when executed by the portable device processor, provided a communications node on the portable device to coordinate with the communications node on the terminal, established a communications link between the portable device and the terminal, and facilitated communications to the terminal and to a communications network node through the terminal network

[58] *See* Ex. 13.

[59] *See* Ex. 18.

[60] *See* Ex. 22.

[61] *See* Ex. 16.

communication interface. That link is what carries the watch's traffic to Samsung's servers: Samsung instructs the user to install applications on the watch from the store on the phone, after which the application "syncs automatically with your watch."[62]

97. The memory of each Smartwatch Accused Product also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. When a user manipulates the Galaxy Wearable interface on the smartphone touchscreen to update the watch software, set notifications and alerts, modify health and fitness data, or select content to be downloaded to the watch, the smartphone sends a message to the watch, which in turn causes code on the watch to execute, including code that causes a message to be sent to Samsung's servers using the smartphone's Internet connection.[63]

98. Each Smartwatch Accused Product was accordingly configured to facilitate communications through the communications node on the terminal and the terminal network interface to a communications network node. That is the only path available to a Bluetooth-only model: if the watch "was set up without a phone, then your most recent activity is stored only on the watch and you will not be able to view it on your phone."[64]

99. The Portable Drive Accused Products met the same limitations, for the same reasons. Each was a portable device configured to communicate with a terminal—a Windows or Mac personal computer, such as a Samsung Galaxy Book—and each had an external communication interface configured to enable the transmission of communications between the portable device and that terminal, namely its universal serial bus conduit. Samsung ships the drive

[62] *See* Ex. 21.

[63] *See* Ex. 20.

[64] *See* Ex. 22.

bundled with USB Type C-to-C and Type C-to-A cables.[65]

100. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. A Windows or Mac personal computer necessarily has a processor, a keyboard and pointing device, a display, and a network interface through which it communicates with servers over the Internet.

101. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component, and second program code which provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. The Samsung Portable SSD Software, which Samsung preinstalls on the drive and which the user runs on the connected computer, presents that interface on the computer's display.[66]

102. Samsung's user manual confirms that the drive reaches Samsung's servers through the computer's network connection rather than any connection of its own: "If your computer is connected to the internet, the number of Software/Firmware updates available will show on the bottom of left panel."[67] That is the communications node on the terminal, and it is the only path by which the drive reaches the network.

103. Each Portable Drive Accused Product had a processor and a memory having executable program code stored thereon, including third program code which, when executed by the portable device processor, provided a communications node on the portable device to coordinate with the communications node on the terminal, established a communications link

---

[65] *See* Ex. 9.

[66] *See* Ex. 15.

[67] *See id.* at 15.

between the portable device and the terminal, and facilitated communications to the terminal and to a communications network node through the terminal network communication interface.[68]

104. The memory of each Portable Drive Accused Product also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. Samsung describes that sequence: "By clicking "UPDATE" button, you can download the latest software ("SW") or firmware ("FW") and update it," and the user may set the drive to have "SW and FW automatically updated whenever Samsung Portable SSD is connected" to the computer.[69]

105. Each Portable Drive Accused Product was accordingly configured to facilitate communications through the communications node on the terminal and the terminal network interface to a communications network node. Samsung's firmware and software update servers are communications network nodes.[70]

106. The Smartphone Accused Products met the same limitations, for the same reasons, when operated with a Windows personal computer through Samsung's Link to Windows feature. Each was a portable device configured to communicate with a terminal: Samsung instructs the user that "you can connect your Galaxy phone and computer for seamless multitasking using Phone Link and Link to Windows."[71]

107. The terminal comprised a processor, an input component, an output component, a network communication interface, and a memory storing executable program code. A Windows

---

[68] *See* Ex. 10.

[69] *See* Ex. 15 at 15.

[70] *See id.*

[71] *Phone Link with your Galaxy phone and Windows 10 or 11 PC*, SAMSUNG, https://www.samsung.com/us/support/answer/ANS10001471/ (last visited Sept. 20, 2026) (Ex. 25).

10 or Windows 11 personal computer necessarily has each of those components, and the memory stores the Phone Link application, which Samsung states "should come preinstalled on most models."[72]

108. The terminal memory stored first program code which, when executed by the terminal processor, presented an interactive user interface on the terminal output component. Samsung describes what that interface does: the user can "mirror your phone's screen, view notifications, transfer files and media, and respond to messages and calls," and "[y]our content will appear directly on your PC so you can view and send messages."[73]

109. The terminal memory also stored second program code which provided a communications node on the terminal to facilitate communications to the portable device and to a communications network node through the terminal network communication interface. Samsung confirms that the phone reaches the network through the computer: "your phone and PC typically need to be on the same network for the Phone Link app to work," and the user must affirmatively enable a separate setting to "allow your phone to connect with mobile data."[74]

110. Each Smartphone Accused Product had an external communication interface configured to enable the transmission of communications between the portable device and the terminal, a processor, and a memory having executable program code stored thereon, including third program code which provided a communications node on the portable device to coordinate with the communications node on the terminal and establish a communications link between them. That code is the Link to Windows feature, which Samsung states is "built right in" to newer Galaxy

---

[72] *See* Ex. 25.

[73] *See id.*

[74] *See id.*

phones.[75]

111. The memory of each Smartphone Accused Product also stored fourth program code configured to be executed by the portable device processor in response to a communication received by the portable device resulting from user interaction with the interactive user interface. When the user answers a call, sends a message, opens an app, or syncs photos from the Phone Link interface on the computer, the computer transmits the resulting command to the phone, and code on the phone executes and causes the corresponding communication to be transmitted to Samsung's servers and third-party servers through the computer's network connection.[76]

112. Each of the four categories of Accused Products also met every limitation of claim 4 of the '969 patent, which depends from claim 2 and recites "wherein the communication caused to be transmitted to the communication network node facilitates the transmission of encrypted communications from the communication network node to the terminal."

113. The communications that the Earbud, Smartwatch, Portable Drive, and Smartphone Accused Products caused to be transmitted to Samsung's servers and third-party servers facilitate the transmission of encrypted communications from those servers back to the terminal. On information and belief, those return communications are protected using Transport Layer Security. This occurs when earbuds and smartwatches retrieve firmware and software updates through a paired smartphone, when a portable drive retrieves a firmware update through the connected computer, and when a smartphone retrieves messages, notifications, and media through a connected computer.

114. Each of the four categories of Accused Products also met every limitation of claim

---

[75] *See* Ex. 25.

[76] *See id.*

10 of the ’969 patent, which depends from claim 2 and recites “wherein the communication network node comprises a database and the communication caused to be transmitted to the communication network node facilitates synchronizing content on the portable device with content on the communication network node database.”

115. Samsung’s servers comprise databases, and the communications the Accused Products caused to be transmitted facilitate synchronizing content on the portable device with content in those databases. Samsung describes that synchronization for each category: earbuds and smartwatches registered to a Samsung account sync settings and health data, with Samsung directing the user to “Sync with Samsung Cloud” and then “Sync now”[77]; a portable drive synchronizes its firmware and management software with the versions Samsung publishes[78]; and a smartphone connected through Link to Windows syncs photos, files, messages, and calendars between the phone and the computer.[79]

116. On information and belief, and for all the reasons above, Samsung infringed at least claims 4 and 10 of the ’969 patent.

117. As a result of Samsung’s infringement of the ’969 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Samsung’s infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

**COUNT III**
**INFRINGEMENT OF U.S. PATENT NO. 10,397,374**

118. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint

[77] *See* Ex. 22.

[78] *See* Ex. 15 at 15.

[79] *See* Ex. 25.

as if fully set forth herein.

119. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the ’374 patent, including the right to recover damages for past infringement. The ’374 patent is valid and enforceable.

120. On information and belief, Samsung has infringed the ’374 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 1 and 3 of the ’374 patent, including the Smartwatch Accused Products and the Smartphone Accused Products identified above. Samsung’s infringement dates from at least six years prior to the filing of this Complaint until the expiration of the ’374 patent on March 23, 2024. On information and belief, in relevant respects for those products, SEC and SEA acted in concert with one another.

121. During the infringing time period, those products met every limitation of at least claim 1 of the ’374 patent, which recites:

> 1. A portable device configured to communicate with a communications network, the communication network comprising (i) a communications network node, and (ii) a terminal, the terminal comprising a processor, an output component configured to present a graphical interactive user interface comprising at least one user interface element configured to be manipulated by a user to enable control of the portable device, a network interface, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, presents the graphical interactive user interface by the terminal output component, receives a command resulting from user manipulation of a user interface element of the graphical interactive user interface, and causes a communication to be transmitted to the portable device in response to the command resulting from user manipulation of a user interface element of the graphical interactive user interface, the portable device comprising:
>
> (a) at least one communication interface configured to enable the transmission of communications between the portable device and the communications network;
>
> (b) a processor; and
>
> (c) a memory having executable program code stored thereon, including:
>
> (1) second program code which, when executed by the portable device processor, enables the portable device to cause a communication to be sent

> to the communications network node;
> (2) third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the graphical interactive user interface, causes a communication to be transmitted to the communications network node; and
> (3) fourth program code which, when executed, affects the presentation of the graphical interactive user interface by the terminal output component;
>
> wherein the portable device is configured to communicate with the terminal and to securely communicate with the communications network node.

122. Each Smartwatch Accused Product was a portable device configured to communicate with a communications network comprising a communications network node and a terminal. The Smartwatch Accused Products communicate with Samsung's servers and third-party servers using their own Wi-Fi or cellular connection or by leveraging the network connection of a paired smartphone, and they communicate with smartphones over Wi-Fi or Bluetooth.[80]

123. The terminal comprised a processor and an output component configured to present a graphical interactive user interface with at least one user interface element that a user manipulates to control the portable device. A smartphone running the Galaxy Wearable application presents such an interface on its touchscreen, and a user controls the paired Smartwatch Accused Product through that interface by, among other things, pairing the smartwatch and smartphone, updating the software on the smartwatch, setting notifications and alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the smartwatch.[81]

124. The terminal also comprised a network interface and a memory storing first program code which, when executed by the terminal processor, presented the graphical interactive user interface, received a command resulting from the user's manipulation of a user interface element, and caused a communication to be transmitted to the portable device in response. The

---

[80] *See* Ex. 13.

[81] *See id.*

smartphone necessarily has a Wi-Fi or cellular network connection, and the Galaxy Wearable application is the code that presents the interface, receives the user's commands, and sends the resulting message to the watch.

125. Each Smartwatch Accused Product had at least one communication interface configured to enable the transmission of communications between the portable device and the communications network. Network-equipped Smartwatch Accused Products communicate with Samsung's servers and third-party servers over their own Wi-Fi or cellular connection.

126. Samsung's published specifications for the Galaxy Watch Ultra confirm that the device carries its own processor, its own memory, and its own cellular network interface in the form of an embedded SIM.[82]

127. Each Smartwatch Accused Product had a processor and a memory having executable program code stored thereon, including second program code which, when executed by the portable device processor, enabled the portable device to cause a communication to be sent to the communications network node. The Smartwatch Accused Products necessarily have code that sends messages to Samsung's servers and third-party servers.

128. The memory of each Smartwatch Accused Product also stored third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the graphical interactive user interface, caused a communication to be transmitted to the communications network node. Interacting with the touchscreen of a smartphone connected to a Smartwatch Accused Product through the Galaxy Wearable application causes a message to be sent to the

[82] *Galaxy Watch Ultra*, SAMSUNG, https://www.samsung.com/us/watches/galaxy-watch-ultra/buy/galaxy-watch-ultra-47mm-titanium-gray-sm-l705udaaxaa/ (last visited Sept. 18, 2026) (Ex. 16).

smartwatch, which in turn causes code on the smartwatch to execute that causes a message to be sent to Samsung's servers or third-party servers.

129. The memory of each Smartwatch Accused Product also stored fourth program code which, when executed, affected the presentation of the graphical interactive user interface by the terminal output component. The Smartwatch Accused Products have code that, when executed, affects what is displayed on the touchscreen of the connected smartphone. After the user pairs the devices, updates the watch software, sets notifications and alerts, modifies health and fitness data, or selects content to be downloaded to the watch, the smartphone display is updated to reflect that the action has been completed.

130. Each Smartwatch Accused Product was configured to communicate with the terminal and to securely communicate with the communications network node. The Smartwatch Accused Products communicate with smartphones through the Galaxy Wearable application over Bluetooth or Wi-Fi, and communicate securely (e.g., TLS) using their WiFi capability with Samsung's servers and third-party servers over encrypted connections.

131. The Smartphone Accused Products separately met every limitation of claim 1, when operated with a vehicle infotainment system through Android Auto. Each was a portable device configured to communicate with a communications network comprising a communications network node and a terminal: the phone reaches Samsung's servers and third-party servers over its own cellular or Wi-Fi connection, and it communicates with the vehicle head unit over the USB or wireless Android Auto connection.[83]

132. The terminal comprised a processor and an output component configured to present a graphical interactive user interface with at least one user interface element that a user manipulates

[83] *See* Ex. 12.

to control the portable device. Android Auto brings apps "on your car display," and the user manipulates the elements of that display to place calls, send and receive messages, select navigation destinations, and choose media.[84]

133. The terminal also comprised a network interface and a memory storing first program code which, when executed by the terminal processor, presented the graphical interactive user interface, received a command resulting from the user's manipulation of a user interface element, and caused a communication to be transmitted to the portable device in response. The Android Auto software resident on the vehicle head unit performs each of those functions.[85]

134. Each Smartphone Accused Product had at least one communication interface configured to enable the transmission of communications between the portable device and the communications network, namely its cellular and Wi-Fi radios, and had a processor and a memory having executable program code stored thereon, including second program code which, when executed by the portable device processor, enabled the phone to cause a communication to be sent to the communications network node.

135. The memory of each Smartphone Accused Product also stored third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the graphical interactive user interface, caused a communication to be transmitted to the communications network node. When the user selects a navigation destination, requests media, or dictates a message on the vehicle display, the head unit transmits the resulting command to the phone, and the phone executes code that transmits a corresponding communication over its own cellular or

---

[84] *See* Ex. 17.

[85] *See* Ex. 12.

Wi-Fi connection to the servers that supply the directions, the media, or the messaging service.[86]

136. The memory of each Smartphone Accused Product also stored fourth program code which, when executed, affected the presentation of the graphical interactive user interface by the terminal output component. The navigation, telephone, and media content the phone retrieves over its own network connection is rendered on the vehicle display, and the display updates to reflect each action the user takes.[87]

137. Each Smartphone Accused Product was configured to communicate with the terminal and to securely communicate with the communications network node. On information and belief, the communications between a Galaxy smartphone and Samsung's servers and third-party servers over its cellular and Wi-Fi connections are protected using Transport Layer Security.

138. The Smartwatch Accused Products and the Smartphone Accused Products also met every limitation of claim 3 of the '374 patent, which depends from claim 1 and recites "wherein the third program code, when executed by the portable device processor, causes a secure communication to be transmitted through the terminal network interface to the communications network node."

139. Claim 1 is practiced when the portable device leverages its own network connection, and claim 3 adds the tunneling architecture in which the portable device instead reaches the network node through the terminal's network interface. The Accused Products practiced both. Taking the Smartwatch Accused Products first: a network-equipped Smartwatch Accused Product reaches Samsung's servers directly over its own Wi-Fi or cellular connection, and the same device reaches those same servers through the paired smartphone's Internet

[86] *See* Ex. 12.

[87] *See* Ex. 17.

connection when the watch has no network of its own available or when the user acts through the Galaxy Wearable application.[88]

140. Those communications are secure. On information and belief, communications transmitted through the terminal network interface to Samsung's servers and third-party servers are protected using Transport Layer Security. This occurs, for example, when pairing the smartwatch and smartphone, updating the software on the smartwatch, setting notifications and alerts, modifying health and fitness data, and selecting content to be downloaded to or synchronized with the smartwatch.[89]

141. Turning to the Smartphone Accused Products: each likewise practiced claim 3 when connected to a vehicle head unit through Android Auto. On information and belief, vehicle infotainment systems compatible with Android Auto include their own network interfaces, including embedded cellular modems and Wi-Fi radios, and a connected Smartphone Accused Product is configured to transmit secure communications to communications network nodes through that terminal network interface. The phone therefore practices claim 1 through its own connection and claim 3 through the terminal's.[90]

142. On information and belief, and for all the reasons above, Samsung infringed at least claims 1 and 3 of the '374 patent.

143. As a result of Samsung's infringement of the '374 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Samsung's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

---

[88] *See* Ex. 18.

[89] *See* Ex. 20.

[90] *See* Ex. 12.

**COUNT IV**
**INFRINGEMENT OF U.S. PATENT NO. 10,447,819**

144. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

145. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the ’819 patent, including the right to recover damages for past infringement. The ’819 patent is valid and enforceable.

146. On information and belief, Samsung has infringed the ’819 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claim 184 of the ’819 patent, including the Smartwatch Accused Products and the Smartphone Accused Products identified above. Samsung’s infringement dates from at least six years prior to the filing of this Complaint until the expiration of the ’819 patent on March 23, 2024. On information and belief, in relevant respects for those products, SEC and SEA acted in concert with one another.

147. During the infringing time period, those products met every limitation of at least claim 184 of the ’819 patent, which recites:

> 184. A portable device configured to communicate with a communications network comprising a communications network node and with a terminal comprising an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user to enable control of the portable device, the portable device comprising:
>
> a. a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications network node to the portable device;
>
> b. a communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal;
>
> c. a processor configured to stream data content for presentation by the terminal output component; and

d. a memory having executable program code stored thereon, including:

i. first program code which, when executed, presents an interactive user interface on the terminal output component, receives a command resulting from user manipulation of a user interface element of the interactive user interface, and causes a communication to the portable device processor in response to the command resulting from user manipulation of a user interface element of the interactive user interface;

ii. second program code which, when executed by the portable device processor, enables the portable device to communicate with the communications network node;

iii. third program code which, when executed by the portable device in response to a command resulting from user manipulation of a user interface element of the interactive user interface, causes a communication to be transmitted through the portable device network interface to the communications network node; and

iv. fourth program code which, when executed by the portable device, processes data content received from the communications network node through the portable device network interface for transmission through the communications interface to the terminal and presentation by the terminal output component.

148. Each Smartwatch Accused Product was a portable device configured to communicate with a communications network comprising a communications network node and with a terminal, as described above. Samsung offers both Bluetooth and LTE models of its smart watches, and states that the LTE models "stand out by allowing users to receive calls and messages without needing to be tethered to a smartphone."[91]

149. The terminal comprised an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user to enable control of the portable device. The Galaxy Wearable application presents such an interface on the smartphone touchscreen.[92] Samsung directs the user to "connect your smart watch to your phone using the Galaxy Wearable app," and explains that the user may then "use the app

---

[91] *Activate LTE service for your Samsung Galaxy Watch*, SAMSUNG, https://www.samsung.com/us/support/answer/ANS10003298/ (last visited Sept. 18, 2026) (Ex. 19).

[92] *See* Ex. 13.

to manage and monitor your watch's features and apps installed from the Play Store."[93]

150. Samsung depicts that interface in its own support materials, showing the Galaxy Wearable application presenting "Manage content," "Mobile plans," and "General" user interface elements that the user manipulates to control the paired smartwatch:[94]




151. Each Smartwatch Accused Product had a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications network node to the portable device. Samsung's published specifications for the Galaxy Watch

[93] *Set up your Samsung smart watch with or without a phone*, SAMSUNG, https://www.samsung.com/us/support/answer/ANS10002899/ (last visited Sept. 18, 2026) (Ex. 18).

[94] *See* Ex. 19.

Ultra list an "Embedded-SIM" under the heading "Network,"[95] and Samsung instructs the user to activate carrier service on the watch through the Galaxy Wearable application's "Mobile plans" menu, after which "[t]he app will search for an eligible LTE network."[96]

152. The data content transmitted from Samsung's servers to the watch over that connection includes software updates, applications, watch faces, music, and images. Samsung instructs the user that a watch set up without a phone may "apply updates from the watch itself," and that the watch may "automatically download software updates over a Wi-Fi network."[97] Samsung likewise instructs that "a stable network connection is crucial when using the Galaxy Store on the watch."[98]

153. Each Smartwatch Accused Product had a communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal. The Smartwatch Accused Products communicate with paired smartphones over Bluetooth and Wi-Fi, and Samsung states that the user can "automatically sync data between the two of them, such as your workout information from Samsung Health."[99] Samsung confirms that this data content originates on the watch and is transmitted to the phone for presentation there: if the watch "was set up without a phone, then your most recent activity is stored only on the watch

---

[95] *See* Ex. 16.

[96] *See* Ex. 19.

[97] *Update software and apps on your Samsung smart watch*, SAMSUNG, https://www.samsung.com/us/support/answer/ANS10001571/ (last visited Sept. 18, 2026) (Ex. 20).

[98] *Manage apps on your Samsung smart watch*, SAMSUNG, https://www.samsung.com/us/support/answer/ANS10002865/ (last visited Sept. 18, 2026) (Ex. 21).

[99] *See* Ex. 18.

and you will not be able to view it on your phone."[100]

154. Each Smartwatch Accused Product had a processor configured to stream data content for presentation by the terminal output component. Samsung's published specifications for the Galaxy Watch Ultra identify a processor operating at "1.6GHz,1.5GHz" and 21.1 GB of available storage.[101] That processor streams the recorded activity, health, and status data described above to the paired smartphone, where the Samsung Health and Galaxy Wearable applications present it on the smartphone display.[102]

155. Each Smartwatch Accused Product had a memory having executable program code stored thereon, including first program code which, when executed, presents an interactive user interface on the terminal output component, receives a command resulting from user manipulation of a user interface element of that interface, and causes a communication to the portable device processor in response. The Galaxy Wearable application presents the interface on the smartphone, receives the user's commands, and sends the resulting communication to the watch. Samsung describes that sequence for application installation: the user navigates in the Galaxy Wearable application to the appropriate store, "select[s] the desired app, and initiat[es] the install, which syncs automatically with your watch."[103]

156. The memory of each Smartwatch Accused Product also stored second program code which, when executed by the portable device processor, enabled the portable device to communicate with the communications network node. A Galaxy smartwatch that downloads

---

[100] *Samsung Health data is not syncing between Galaxy watch and phone*, SAMSUNG, https://www.samsung.com/us/support/troubleshoot/TSG10004735/ (last visited Sept. 18, 2026) (Ex. 22).

[101] *See* Ex. 16.

[102] *See* Ex. 22.

[103] *See* Ex. 21.

applications through the Galaxy Store on the watch, or that applies a software update "from the watch itself," necessarily executes code resident on the watch that communicates with Samsung's servers over the watch's own network interface.[104]

157. The memory of each Smartwatch Accused Product also stored third program code which, when executed by the portable device in response to a command resulting from user manipulation of a user interface element of the interactive user interface, caused a communication to be transmitted through the portable device network interface to the communications network node. Samsung instructs the user to "use the Galaxy Wearable app to regularly check for updates" to the watch's software,[105] and to install applications on the watch by tapping "Install" in the store on the phone, after which the application "will automatically install on your watch."[106] In each case, the user's manipulation of a user interface element on the smartphone causes the watch to request the corresponding content from Samsung's servers.

158. The memory of each Smartwatch Accused Product also stored fourth program code which, when executed by the portable device, processed data content received from the communications network node through the portable device network interface for transmission through the communications interface to the terminal and presentation by the terminal output component. When a Smartwatch Accused Product downloads a software update, an application, a watch face, or music over its own network connection, code on the watch processes that content and transmits it to the paired smartphone, where the Galaxy Wearable application presents the result. Samsung describes both halves of that sequence: while an update "is being applied, the

---

[104] *See* Ex. 20; Ex. 21.

[105] *See* Ex. 20.

[106] *See* Ex. 21.

watch will reboot and show a progress bar or rotating animation,"[107] and the user is directed to "use the Galaxy Wearable app to check for available software updates for your watch and apps installed on the watch."[108] The Galaxy Wearable application likewise presents the applications installed on the watch and their settings, which the user may reorder and configure from the smartphone.[109]

159. The Smartphone Accused Products separately met every limitation of claim 184. Each was a portable device configured to communicate with a communications network comprising a communications network node and with a terminal, namely a vehicle head unit running Android Auto, whose output component presents an interactive user interface with user interface elements the user manipulates to control the phone.[110]

160. Each Smartphone Accused Product had a network interface configured to enable the transmission of communications between the portable device and the communications network node, wherein the communications comprise data content transmitted from the communications network node to the portable device, namely its cellular and Wi-Fi radios, over which the phone receives navigation, media, and messaging content from Samsung's servers and third-party servers.

161. Each Smartphone Accused Product had a separate communications interface configured to enable the transmission of communications between the portable device and the terminal, wherein the communications comprise a data content stream transmitted from the portable device to the terminal. As Google explains, the user may connect the phone to the vehicle

---

[107] *See* Ex. 20.
[108] *See* Ex. 22.
[109] *See* Ex. 21.
[110] *See* Ex. 12.

display "(with a USB cable)" or wirelessly, and either connection carries the stream that the vehicle display renders.[111]

162. Each Smartphone Accused Product had a processor configured to stream data content for presentation by the terminal output component, and a memory storing the four sets of program code the claim requires: first program code presenting the interactive user interface on the vehicle display and receiving the user's commands; second program code enabling the phone to communicate with the network node; third program code which, executed in response to those commands, causes a communication to be transmitted through the phone's own network interface to the network node; and fourth program code which processes the content received from the network node for transmission to, and presentation by, the vehicle display.[112]

163. On information and belief, and for all the reasons above, Samsung infringed at least claim 184 of the '819 patent.

164. As a result of Samsung's infringement of the '819 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Samsung's infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

## COUNT V
## INFRINGEMENT OF U.S. PATENT NO. 10,992,786

165. IOENGINE incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

166. IOENGINE is the assignee and lawful owner of all right, title, and interest in and to the '786 patent, including the right to recover damages for past infringement. The '786 patent

[111] *See* Ex. 12.

[112] *See* Ex. 17.

is valid and enforceable.

167. On information and belief, Samsung has infringed the ’786 patent in violation of 35 U.S.C. § 271(a), either literally or through the doctrine of equivalents, by making, using, selling, offering for sale, and/or importing into the United States products that practiced at least claims 1 and 20 of the ’786 patent, including the Smartphone Accused Products and the Smartwatch Accused Products. Samsung’s infringement dates from at least six years prior to the filing of this Complaint until the expiration of the ’786 patent on April 13, 2024. On information and belief, in relevant respects for those products, SEC and SEA acted in concert with one another.

168. During the infringing time period, those products met every limitation of at least claim 1 of the ’786 patent, which recites:

> 1. A portable device configured to communicate with (i) a terminal comprising a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory configured to store executable program code, including first program code which, when executed by the terminal processor, is configured to receive a command resulting from user manipulation of a user interface element of the interactive user interface, affect the presentation of the interactive user interface by the terminal output component in response to the command resulting from user manipulation of a user interface element, and cause a communication to be transmitted from the terminal to the portable device in response to the command resulting from user manipulation of a user interface element and (ii) a communications network comprising a plurality of communications network nodes, the portable device comprising:
>
> (a) a first communication interface configured to enable transmission of communications between the portable device and the terminal;
>
> (b) a second communication interface configured to enable transmission of communications between the portable device and a communications network node;
>
> (c) a processor; and
>
> (d) a memory having executable program code stored thereon, including
>
> (1) second program code which, when executed by the portable device processor, is configured to facilitate communications through the second communication interface between the portable device and the communications network node; and
>
> (2) third program code which, when executed by the portable device processor in response to a communication received by the portable device

> from the terminal resulting from user manipulation of a user interface element of the interactive user interface presented by the terminal output component, is configured to cause a communication to be transmitted through the second communication interface to the communications network node.

169. Each Smartphone Accused Product was a portable device configured to communicate with a terminal and with a communications network comprising a plurality of communications network nodes. A Galaxy smartphone communicates with a vehicle infotainment system through Android Auto, and it communicates with Samsung's servers and third-party servers over its cellular and Wi-Fi connections.[113]

170. The vehicle infotainment system is a terminal comprising a processor, an output component configured to present an interactive user interface comprising at least one user interface element configured to be manipulated by a user, and a memory configured to store executable program code. Android Auto "brings apps to your car display," and the user manipulates elements of that display to place calls, send messages, select navigation destinations, and choose media.[114]

171. Google depicts the resulting interface on the vehicle display, showing navigation, telephone, and media user interface elements presented by the terminal output component:[115]

---

[113] *See* Ex. 12.

[114] *See id.*

[115] *Android Auto*, GOOGLE, https://www.android.com/auto/ (last visited Sept. 18, 2026) (Ex. 17).




172. The terminal memory stored first program code which, when executed by the terminal processor, received a command resulting from user manipulation of a user interface element, affected the presentation of the interactive user interface in response, and caused a communication to be transmitted from the terminal to the portable device in response. The Android Auto software resident on the vehicle head unit performs those functions.[116]

173. Each Smartphone Accused Product had a first communication interface configured to enable transmission of communications between the portable device and the terminal. As Google explains, a user may connect the phone to the vehicle display "(with a USB cable)" or wirelessly, and either connection carries the communications between the phone and the head unit.[117]

174. Each Smartphone Accused Product had a second communication interface configured to enable transmission of communications between the portable device and a communications network node, namely its cellular and Wi-Fi radios, through which the phone reaches Samsung's servers and third-party servers.

175. Each Smartphone Accused Product had a processor and a memory having

---

[116] *See* Ex. 12.

[117] *See id.*

executable program code stored thereon, including second program code which, when executed by the portable device processor, facilitated communications through the second communication interface between the portable device and the communications network node. The Smartphone Accused Products necessarily have code that sends and receives data over the phone's cellular and Wi-Fi connections.

176. The memory of each Smartphone Accused Product also stored third program code which, when executed by the portable device processor in response to a communication received from the terminal resulting from user manipulation of a user interface element of the interactive user interface presented by the terminal output component, caused a communication to be transmitted through the second communication interface to the communications network node. When a user selects a navigation destination, requests media, or dictates a message on the vehicle display, the head unit transmits the resulting command to the phone, and the phone executes code that transmits a corresponding communication over its own cellular or Wi-Fi connection to the servers that supply the directions, the media, or the messaging service.[118]

177. Those products also met every limitation of claim 20 of the '786 patent, which depends from claim 1 and recites "wherein the terminal further comprises a network interface and the portable device is configured to transmit a communication through the terminal network interface to a communications network node." On information and belief, vehicle infotainment systems compatible with Android Auto include their own network interfaces, including embedded cellular modems and Wi-Fi radios, and a Smartphone Accused Product connected to such a system is configured to transmit communications to communications network nodes through that network interface.

[118] *See* Ex. 12.

178. The Smartwatch Accused Products met the same limitations of claim 1. Each is a portable device that communicates with a terminal – a smartphone running the Galaxy Wearable application – and with a communications network comprising a plurality of communications network nodes. Each has a first communication interface to the terminal, namely its Bluetooth radio, and a separate second communication interface to the network node, namely its own Wi-Fi or cellular connection.[119]

179. Those two interfaces are separate, and the second does not depend on the first. Samsung markets LTE models that "stand out by allowing users to receive calls and messages without needing to be tethered to a smartphone,"[120] and instructs the user that a watch may "apply updates from the watch itself" and "automatically download software updates over a Wi-Fi network."[121]

180. The memory of each Smartwatch Accused Product stored second program code facilitating communications through that second interface, and third program code which, executed in response to a communication received from the terminal resulting from the user's manipulation of the Galaxy Wearable interface, caused a communication to be transmitted through the second interface to the network node.[122]

181. The Smartwatch Accused Products also met claim 20. A smartphone running the Galaxy Wearable application has a network interface of its own, and a paired Smartwatch Accused Product is configured to transmit communications to Samsung's servers through that interface –

[119] *See* Ex. 16.

[120] *See* Ex. 19.

[121] *See* Ex. 20.

[122] *See* Ex. 21.

which is how a Bluetooth-only model reaches the network at all.[123]

182. On information and belief, and for all the reasons above, Samsung infringed at least claims 1 and 20 of the ’786 patent.

183. As a result of Samsung’s infringement of the ’786 patent, IOENGINE has been damaged. IOENGINE is entitled to recover damages adequate to compensate it for Samsung’s infringement, but in no event less than a reasonable royalty, together with interest and costs, under 35 U.S.C. § 284.

## DEMAND FOR JURY TRIAL

184. IOENGINE hereby demands a jury trial on its claims for patent infringement and any and all issues triable of right before a jury.

## PRAYER FOR RELIEF

WHEREFORE, IOENGINE prays for judgment as follows:

A. That Samsung has infringed and continues to infringe the ’006 patent, and has infringed the ’969, ’374, ’819, and ’786 patents;

B. That Samsung and its officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, be permanently enjoined from engaging in infringing activities with respect to the ’006 patent;

C. An award of a mandatory future royalty payable on each act of infringement of the ’006 patent by Samsung—if injunctive relief is not granted—with respect to the accused products, and on all acts of infringement with respect to products that are not colorably different from products found to infringe;

[123] *See* Ex. 18.

D. That Samsung be required to pay IOENGINE's damages in an amount adequate to compensate IOENGINE for Samsung's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284, as well as any other damages awarded under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of judgment and beyond, with an accounting as needed;

E. That IOENGINE be awarded all statutory and actual damages to which it is entitled, and prejudgment and post-judgment interest;

F. That this case be declared exceptional under 35 U.S.C. § 285 and that IOENGINE be awarded recovery of the costs of this suit, including reasonable attorneys' fees; and

G. That IOENGINE be awarded such other and further relief as this Court deems just and proper.

Dated: September 22, 2026

Respectfully submitted,

/s/ Scott L. Cole

Scott L. Cole (Texas Bar No. (00790481)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
901 S. MoPac Expressway, Bldg. 1, Suite 270
Austin, TX 78746
Telephone: (650) 623-1401
scole@reichmanjorgensen.com

Jaime F. Cardenas-Navia
(*admission request forthcoming*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
650 Fifth Avenue, Suite 2320
New York, NY 10019
Telephone: (212) 381-1965
jcardenas-navia@reichmanjorgensen.com

Michael Caulkins
(*admission request forthcoming*)
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
mcaulkins@reichmanjorgensen.com

*Attorneys for Plaintiff IOENGINE, LLC*